From Tax to Bankruptcy, our final case this morning is number 19-10060, Kathleen and Matthew Feshbach versus the Department of the Treasury. Mr. Rajat? Yes, thank you, Your Honor, and good morning. May it please the Court? The Bankruptcy Court erred in four ways when it held that the Feshbach's 2001 income tax was not discharged by the general discharge they received in their Chapter 7 bankruptcy. First, it erred in determining if the conduct element of Section 523A1C was satisfied solely through the Feshbach spending in contravention of Eleventh Circuit precedent. Second, it erred in its application of the willfulness element of Section 523A1C. Third, it erred in relying on spending activity occurring between 2005 and 2008 when the Feshbachs were enrolled and compliant with an IRS-approved installment agreement. And fourth, alternatively, the Bankruptcy Court erred in determining that 523A1C does not permit partial discharge of a single year's tax debt. So the first issue, the Bankruptcy Court concluded that the Feshbach spending by itself was sufficient to satisfy the conduct element of Section 523A1C. Why shouldn't that be enough? Well, Your Honor. If you have loads of funds, okay, let's put it aside from this case and get away from the facts of this case. But if you owe the IRS a million dollars, right, undisputed, and you are generating – I want to give you a crazy example to make the point. And you're generating $50 million of income a year, and you're spending all of it on an exclusively lavish lifestyle so that you don't have the ability to pay the $1 million owed to the IRS, why should that not be enough to satisfy the conduct prong of Section 523? Well, I would say two things to that. First, it never has been in the Eleventh Circuit. But second, we are not dealing with an extreme example in this case. The Feshbachs made substantial payments towards their liability. In fact . . . I know, but I don't want you to get away from the hypothetical until you answer it. So it's one thing to say in this case, given what happened and given the Feshbachs' dealings with the IRS and the installment payments and the offers of compromise and all of that, all that going forward, right, it's one thing to say in this case you can't just look at spending. But we have to write an opinion in this case no matter how we come out. And so I'm asking you whether or not in a given case that sort of spending I hypothesized would be enough to satisfy the conduct prong of Section 523. And so you can tell me why that principle doesn't apply in your client's case. So in the extreme example that you give, I think that would be more fairly viewed as abusive behavior. And although I would point out that there's been no case in the Eleventh Circuit that has said spending by itself is sufficient to satisfy the conduct prong. So in that hypothetical, even there it would involve an expansion of Eleventh Circuit precedent as to the discharge exception, which has to be construed narrowly in a debtor's favor. However, in that extreme example, I think is a different case. And I could very well see that being handled differently. But as you pointed out, and as we pointed out repeatedly in our briefs, this is an extremely different case than your example. Given the substantial efforts the Feshbachs made to comply, given the substantial payments they made, given the substantial cooperation they engaged in with the IRS, and given the fact that they filed bankruptcy only as a last resort, I just want to be clear that we don't feel that your example is close to analogous to the facts of this case. Understood and point taken. Now, even if your theory about the Feshbachs needing to generate a certain amount of income to be able to pay the IRS liabilities holds, there were a couple of items of expenditures that could not have fallen under that sort of rationale, right? So you've got, for example, you've got your son's private school education, you've got the condo or the apartment in Aspen, and you've got the extra cars. So there's not really much you can say about those, right? Those were not needed for the Feshbachs to generate income to be able to pay the IRS debt, or am I wrong about that? Well, so Mr. Feshbach testified that the business that he was operating during the period that this case relates to, during which he was generating sufficient income to be able to make large payments towards the 1999 and 2001 liability, that his entire life was focused on his business and that everything that he did in his life was geared towards building his business and generating income to have money on hand to be able to pay the IRS. So I wouldn't rule those expenses categorically out as being totally unrelated to the generation of income, but I would point out that most of the spending that the government and the bankruptcy court relied on in reaching its decision occurred in that 2005 to 2007 period. While the Feshbachs were compliant with their IRS-approved installment agreement, the installment agreement which resulted from an IRS employee undertaking a, quote, in-depth review of the Feshbachs' expenses and reviewing years and years of credit card statements, bank statements, similar financial documents, and the agreement was approved by that IRS employee's manager, and the IRS had the unilateral ability after the agreement was entered to amend it, to ask for further information, to get an updated status of the Feshbachs' financial information, or to simply terminate it. And the IRS was on notice of the income the Feshbachs were earning each of those years to the timely filing of tax returns, and it never did that. But it also indicated to them that it thought, I think at least a couple of times, that their expenses were too high. Did it not? Well, so to the extent that there are intimations of that in the record, those occurred in the context of the offers in compromise, and it's very important to realize that offers in compromise are very unique aspects of IRS collections. They are, there is an IRS baseline of expenses, and those expenses are only relevant in determining whether the offer submitted by the taxpayer is acceptable. They are not generally applicable principles, and I think that's evidenced by the fact that you've repeated statements from IRS personnel, Revenue Officer Geer, Revenue Officer Goldsmith, Revenue Officer Morris, saying that we don't care what they spend their money on. It's not up to the IRS to tell taxpayers what they spend their money on. Whether their expenses prevent the acceptance of an OIC, that's a different question. They also thought that the Fesh Facts, at least at one point, had the potential to generate over $6 million to pay the IRS, and that's why one of the offers in compromise was rejected. Well, I believe that was the 2002 offer, and I believe both the IRS evaluations of the 2002 and 2008 offers in compromise were riddled with errors. The revenue officers didn't value the assets correctly. They didn't have an understanding of how a partnership interest should be valued. They misinterpreted the amount of income the Fesh Facts were earning. For instance, with respect to the 2008 OIC, Revenue Officer Geer determined that the Fesh Facts were earning something in the range of $30,000 a month. This was in 2009, when in fact on their 2009 tax return, which was accepted as true and correct by the IRS and has never been challenged, they reported a total income of $35,000 a year. So the offers in compromise evaluations performed by the IRS were riddled with errors, and frankly, I don't think they should be afforded too much weight, if any. But why don't you apply the same rationale to the $140,000 installment payment that the Fesh Facts were making? Why wasn't the IRS under the misimpression then to accept such a low sum from them, given the amount of income they were generating? Well, the OIC, like I said, it's a different context. The installment agreement wasn't based on the evaluation of an OIC. It was Revenue Officer Morris looking at the Fesh Facts expenses after doing an in-depth review of them and determining this is the amount they could pay per month. He repeatedly stated he was satisfied with it and he was content with it, and despite having the ability, the IRS never sought to change it. Tell me why you think that 523 allows for a partial discharge, given the language of the statute. Well, on that point, I believe the Bankruptcy Court, first of all, the Bankruptcy Court pointed out that it lacks language similar to the extent or some type of language that would be viewed as limiting, but I think the Bankruptcy Court was mistaken on that point, that to the extent it pointed out in Subsection A2 and A7 goes more towards the type of debt as opposed to the amount. And then as to the language of 523A1C, which is such tax, which the Bankruptcy Court relied on in determining that it was not divisible or not subject to a partial discharge, similar language exists in Section 523A8 relating to student loan discharges. It's similarly binary and appears black and white, yet courts repeatedly order partial discharges, sometimes when there's no undue hardship and sometimes when there is undue hardship. And those courts do that under their equitable power of Section 105A, and in this case, the Bankruptcy Court correctly lamented that an all-or-nothing approach to the partial discharge question leads to absurd results. So if I can use my own extreme example, say, for instance, a tax debtor owes $100,000 and they engage in willful evasion with respect to assets worth $1,000, it would be absurd to, if all other factors were in the tax debtor's favor, it would be absurd to deny discharge to the other $99,000 based on one minor act of willful tax evasion, but that's exactly what the Bankruptcy Court's approach yields. I'll reserve the balance of my time. Thank you. Thank you very much. Mr. Aloulis. May it please the Court, Paul Aloulis, appearing on behalf of the United States. Your Honors, in fact, the law is that one attempt at tax evasion is sufficient to trigger the exclusion from discharge in Section 523A1C. There is no minor evasion of tax. There is no minor willful attempt to evade or defeat the payment or collection of a tax. Would you keep your voice up? Excuse me, Your Honor. Yes. Put the microphone a little closer. I'm simply making the point, Your Honor, that, in fact, one act of evasion is enough to trigger the exception in Section 523A1C. There is no need to have a large collection of evasions, evasions over 10 years, evasions over 20 years. If the government proves one type of evasive conduct, that is enough to trigger the exception from discharge. You may be right, but as of so far, there are no reported cases holding that excessive and lavish spending in and of itself is enough to satisfy Section 523A1C. That is correct, Your Honor, although there are several cases in which it is clear that the lavish spending, the excessive lifestyle, was the main determining factor in the analysis. But Your Honor is correct, that in virtually all of the cases that have been reported, there has been more than one form of conduct. And in this case, the government argued and presented evidence of multiple forms of conduct as well, that the bankruptcy court found it unnecessary to rely upon those other types of conduct in determining whether the fetchbacks here had, in fact, engaged in conduct that triggered. What are the most relevant of those, do you think? Well, Your Honor, I think that there were two. There was, and in fact, one of which the bankruptcy court referred to in its opinion, which is the effort by the fetchbacks to consistently submit inadequate offers in compromise over multiple times, over multiple periods of time, which worked a delay of the IRS's collection efforts. The bankruptcy court specifically referred to that campaign of delay when it analyzed the mental element prong of the Section 523A1C exception. The fetchbacks counsel argues that it would be improper for this court to look to that conduct in deciding whether they had, in fact, satisfied the conduct prong of the exception because the bankruptcy court didn't mention those things specifically in the portion of its opinion in which it discussed conduct. But the opinion is clear that the bankruptcy court was making factual findings about their offer in compromise efforts, and the fact that they were inadequate, the fetchbacks should have known that they were woefully inadequate and that the effort in making those offers in compromise was an effort at delay in order to stop the IRS from engaging in enforced collections. What was the other one? The other one, Your Honor, was the fact that the fetchbacks provided inaccurate information to the IRS during the offer in compromise process as well as during the offer in compromise process in two different instances. For example, when the fetchbacks submitted their 2001 offer in compromise, they submitted a collection information statement that reflected lower income than they actually had. They reported on that collection information statement, which is known as a Form 433A, a monthly income of $15,000, but the IRS agent who examined it determined that their income must have been $43,000 per month based on information on their 2002 return, and that comes from Plaintiff's Exhibit 16. Similarly, the fetchbacks submitted a collection information statement in 2008 in connection with the offer in compromise that they made that year. In that collection information statement, they indicated a monthly income of $833, but they indicated expenses of $12,000. The agent expressed some discomfort in that. How could somebody have $800 of income but have $12,000 of expenses, and they indicated no source for the funds to pay those extra expenses? The agent conducted an analysis of their expenditures and ultimately determined through that analysis of expenditures that their income was more likely to be something like $25,000 per month. And in fact, at the end of that year, for 2008, the fetchbacks reported $193,000 of income, which is vastly more than they should have had if they were only earning the $833 per month that they reported on their collection information statement. And so the Bankruptcy Court didn't address those facts in its opinion at all, but the government certainly presented that evidence at court, and the government argued that issue in its post-trial briefing. And so we would submit that if this court concludes that the evidence of their asset dissipation by itself is not adequate to support a finding that the exception to discharge has been triggered, then the court should remand for the bankruptcy court in the first instance to analyze whether these other factors, the inaccurate information provided to the IRS, as well as the delay occasioned by their offers in compromise, the Bankruptcy Court should be allowed to reconsider again whether those factors in conjunction with the asset dissipation would be adequate to meet the conduct prong. Can I ask you a question about the intent prong? Of course, Your Honor. There have been various different formulations of it, even in this circuit. And obviously, as both sides know from the brief, the Ninth Circuit articulated a sort of higher, at least in terms of verbiage, a higher standard in the franchise tax case of specific intent. Yes, Your Honor. What do you think the correct formulation of the intent prong of 523 is? The correct formulation is as this court and many other courts besides the Ninth Circuit has stated, and that is whether the debtor, taxpayer, had a duty to pay their taxes, whether they knew of that duty, and whether they voluntarily and intentionally violated that duty. That's the test. Stop one second. I think I understand that answer, and that's what I expected. That seems to be a formulation of the specific intent standard required in tax cases. Right? The violation of a known legal duty. Correct, Your Honor. Which is a version of specific intent. So how does the formulation with the three prongs you just laid out differ, if at all, from the Ninth Circuit's vision of a specific intent? Well, Your Honor, the Ninth Circuit, in fact, in the Hawkins opinion, expressly rejected application of that three-part test, and the Ninth Circuit in that opinion said, we are applying something different than that three-part test. And what the Ninth Circuit said is that it must be demonstrated that the taxpayer engaged in the conduct with the specific intent to ensure that they were evaded their taxes. How is that different than having a duty, knowing about the duty, and knowingly violating the duty? If you have a duty to pay, you know you have a duty to pay, and you are knowingly breaching that duty, how is that different than the specific intent that the Ninth Circuit talked about? Well, Your Honor, the Ninth Circuit equated that type of specific intent to fraudulent intent, to bad intent, to an effort to defraud the government. And the Supreme Court, even in discussing the criminal version of the formulation, has said that it is possible to commit even criminal, willful evasion of taxes without having a fraudulent intent towards the government. And in doing that, the Supreme Court specifically talked about nonpayment cases. And I think that, Your Honor, this case provides a perfect example of that. The fact is that the question is whether they were making a knowing, voluntary choice to not pay their taxes. And that is, in fact, what happened here. Every single time that the Feshpaks spent money on the house in Aspen, every single time that they spent money to go on another trip, that they spent money on their chef, on their maid, every single time they were doing those things, they were choosing to spend their money on those excesses rather than spending their money on their taxes. And I would just point out to the Court that this Court in Jacobs specifically cited with approval Gardner from the Third Circuit and the way that this Court, when discussing this willfulness element, and this is how this Court described the Court's decision in Gardner. The debtor willfully avoided payment of his tax liabilities when he acknowledged that he was aware of his legal responsibility to pay the taxes and could have used some of his earnings to do so but made a conscious decision not to apply the money she earned towards the debt. And that's what we have here. Every single time they made one of these expenditures, they were making a conscious decision not to apply their millions of dollars in income against their outstanding tax debt. And, Your Honor, I know that counsel has indicated that most of the conduct that the Bankruptcy Court focused on was during the period of the installment agreement. It's not true. There's plenty of this type of excessive spending outside the installment agreement. Simply looking at the year 2002, in the year 2002, that's the year in which the taxpayers filed their tax return for 2001 in which they reported a $3.2 million liability. They reported that $3.2 million liability for 2001 in May of 2002 when they filed their tax return. In September of 2002, they made an offer in compromise for both their 1999 and 2001 taxes for $1.25 million. Their total outstanding at that time was $6 million. In that year, they reported $611,000 of income, they spent $764,000 on personal expenses, and they paid $0 towards their 1999 liability and their 2001 liability. When they reported their tax liability on their 2001 return in 2002, they made zero payment with the return. And yet that same year, they spent $764,000 on personal expenses. Now, Your Honor, also ask the question whether there could be some expenses that were relevant towards generating business in Mr. Feshbach's investment company in order to earn more income with which to pay the funds back. Well, the Feshbachs separately categorized business expenses and all of their expenses. And so if you subtract out what they categorized as business expenses in 2002, the number is $669,000 spent on personal income. And so that pattern repeats itself over and over and over again. This is not one piece of conduct. In 2003, the Feshbachs reported $738,000 of income. They spent $677,000 after subtracting out their business expenses. They paid $0 towards their 1999 and 2001 liabilities. The same thing again in 2004. That year, they spent $823,000 on personal expenses, and they paid $0 towards their 1999 and 2001 liabilities. Were any taxes due and owing in those years separately? There was, Your Honor. Those were paid? That's correct, Your Honor. Yes. Now, in 2005, the Feshbachs ultimately did enter into an installment agreement with the Internal Revenue Service. That installment agreement required them to pay $120,000 per quarter towards their 2001 liability. And this is another point that doesn't come out in the briefs. The Feshbachs, in their briefs, often conflate the 1999 and the 2001 liabilities, and they say, well, we paid substantially more than the total principal of 1999 and 2001. But, Your Honors, every tax year stands on its own. Whether the Feshbachs ultimately satisfied their 1999 tax liability says nothing about whether they willfully attempted to evade or defeat their 2001 tax liabilities. And while they did, in fact, make payments pursuant to the installment agreement, it's important to understand the context in which those payments were being made. That installment agreement was entered after they had failed to pay for multiple years and their opposite compromise had been rejected and their case was being sent out for enforced collection. And so it was under the threat of enforced collection, the possibility of seizure of assets, the possibility of enforcement of liens. That was the context in which they came to the table and entered the installment agreement. Now, regarding the amount of the installment agreement, the agent that entered into that agreement with the Feshbachs testified at trial that part of the reason why he agreed to the number, it is true, he took into account their expenses. One of the expenses that he thought that the Feshbachs had was paying back a loan that he thought that they had taken out to pay the 1999 taxes. But at trial, Mr. Feshbach testified that he didn't take out a loan to pay those 1999 taxes, that, in fact, he invaded his capital account at his investment firm. And so there well may have been a misunderstanding on the agent's part as to what the Feshbachs' outstanding obligations were. As well, the Feshbachs' income greatly increased right after they entered into the installment agreement. In the years 2005, 2006, 2007, they earned $3 million, $4 million a year. Now, it's true that the IRS didn't come back and ask them to up the amount they were paying. Can I ask you a question? Of course, Your Honor. Yes, Your Honor. There were two agreements, as I understand the record, and maybe I don't have a full grasp of it yet. There was an agreement to pay the $120,000 per quarter. Yes. And then there was the other agreement to pay, what was it, $14,000? $15,000. A month. Yes, Your Honor. When did the agreement to pay $140,000 per quarter end? That ended in 2008 when they stopped paying on it. And what about the $14,000, $15,000 a month agreement? That agreement was entered in 2011. They made, I believe, four payments under that agreement and then filed for bankruptcy. Yes, Your Honor. All right, thank you very much. I see that my time has elapsed. Thank you, Your Honor. I'd just like to point out a couple of things that my colleague mentioned. First of all, the spending between 2005 and 2007 was absolutely crucial to the decision of the bankruptcy court, and it cannot fairly be said that absent that spending, it would have reached the same decision. So at the very least, it would be necessary to remand this case to determine whether absent the spending that occurred during the period of the Feshbeck's installment agreement, if that were excluded, whether the bankruptcy court would have reached the same conclusion. Opposing counsel also pointed out activity occurring between 2002, 2003, and 2004. Well, the fact is in 2005, the Feshbecks made a payment of about $2.7 million, which satisfied the remaining balance of 1999, and $2.7 million was greater than their total income in 2002, 2003, 2004 combined. And also, in making that payment, the Feshbecks did not attempt at all to get out of any of the accrued interest or penalties associated with 1999, even though they probably would have had a very good opportunity to at least argue for reasonable cause relief to get out of some of the penalties, even knowing that eventually in bankruptcy, penalties are dischargeable, notwithstanding a non-dischargeability determination under 523A1C. Opposing counsel points out that the installment agreement was made under the threat of enforced collection. Well, that's the reality of every installment agreement reached with every tax debtor in this country, and same with every OIC. They're only ever reached or they're only ever made when the threat of enforced collection is out there. That's simply the nature of the system. So if that's a factor in determining that discharge is not appropriate in this case, then that factor has to be taken into account in every single tax bankruptcy case that occurs because enforced collection is part of every single one of those cases. And the fact that the Feshbecks submitted these OICs should not be used against them. It was not reasonable for the bankruptcy court to conclude that Mr. Feshbeck had sufficient knowledge of the underlying regulations to overrule the advice that he received from counsel on each of the three OICs he submitted. If he had such knowledge, then he would also know that the IRS Internal Revenue Manual dictates that when an OIC is submitted solely for purposes of delay, the IRS agent that receives it is instructed to return it. He would also know that the regulations that govern OICs indicate that when an OIC is frivolous, it should be rejected. And none of those things ever happen. So if he was knowledgeable about the underlying regulations relating to OICs, he would have known that the failure of the IRS to return or reject an OIC indicated that the IRS viewed them as acceptable and worth evaluating. Thank you. All right. Thank you both very much. We're in recess until tomorrow morning. Thank you.